UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
NORTHERN DIVISION
(at Covington)

| | | |
|---|---|---|
| CHRISTINE ANDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Civil Action No. 2: 10-116-DCR |
| | ) | |
| STANLEY M. CHESLEY, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |
| and | ) | |
| | ) | |
| | ) | |
| CANDACE WENGER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| V. | ) | Civil Action No. 2: 10-117-DCR |
| | ) | |
| STANLEY M. CHESLEY, et al., | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\* \*\*\* \*\*\* \*\*\* \*\*\* \*\*\*

**MEMORANDUM OPINION AND ORDER**

\*\*\* \*\*\* \*\*\* \*\*\* \*\*\* \*\*\* \*\*\* \*\*\* \*\*\*

*Pro se* Plaintiffs Christine Anderson and Candace Wenger were members of a state court class action styled: *John Doe, et al. v. Roman Catholic Diocese of Covington, et al.,* Commonwealth of Kentucky, Boone Circuit Court, No. 03-CI-181 (hereafter, "the *Catholic Diocese* litigation"). The action settled in January 2006 with the defendants to that action and

their insurance carriers paying approximately $84,000,000.00 into various settlement funds. Due to interest accruing on investments before payments were made to various claimants, the total settlement amount increased. Following this settlement, a procedure was established and approved by the court to resolve claims and distribute portions of the settlement funds to various claimants alleging a variety of injuries and damages.

Anderson filed a claim after settlement was reached and received cash payments from two funds totaling $400,000.00. Wenger did not claim to have been personally abused. However, she did submit a claim on behalf of her father's estate (the Stanley Wenger estate) on September 25, 2006. Although this claim was denied initially, Wenger eventually received $200,000.00 as administrator of the estate.

Anderson and Wenger signed general releases in December 2006 and December 2007, respectively. However, on May 27, 2010, the plaintiffs filed this civil action alleging various claims against the attorneys who had represented them in the *Catholic Diocese* litigation. In response, the defendants moved the Court to dismiss the plaintiffs' claims pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. However, because the defendants relied upon matters outside the pleadings in support of their Rule 12 motions, the Court converted the defendants motions to motions for summary judgment pursuant to Rule 12(d), Fed. R. Civ. P.

In support of the pending motions, the defendants assert that the plaintiffs' claims are time-barred. Additionally, they have submitted releases executed by the plaintiffs. The defendants assert that the language of these releases has the effect of discharging the claims set out in this action. Further, the defendants argue that the claims asserted by the plaintiffs

constitute impermissible collateral attacks on the state court proceedings. Having reviewed all of the materials submitted by the parties, the Court agrees that dismissal of all the claims asserted by the plaintiffs is not appropriate at this stage of the proceedings. Therefore, the defendants' motions will be denied, without prejudice to being renewed following an adequate period of discovery.

## I.

### A. Settlement of the *Catholic Diocese* litigation

Accounting firm Clark Schaefer Hackett was retained as an independent auditor of the settlement fund established in the *Catholic Diocese* litigation. This firm's report outlines the procedures followed in settlement. The following quotation is taken from its May 26, 2009, report which is attached as Exhibit 4 to both of the defendants' motions [Anderson Record No. 50; Wenger Record No. 47].

> The Doe v. Roman Catholic Diocese of Covington Settlement Fund (Settlement Fund) was created by a settlement agreement between the Class and the Diocese entered into on May 17, 2005 and supplemented on July 18, 2005. Settlements with the Diocese's two insurance carriers, the Catholic Mutual insurance entities (Catholic Mutual) and American Insurance, were entered into in April, 2006. The class action settlement, totaling $84 million, was approved by the Boone Circuit Court on January 31, 2006. It consisted of: (1) $40 million from the Diocese and $4 million from American Insurance deposited into the Doe Class Settlement Fund Escrow Account (Doe Account); and (2) $15 million in cash and $25 million in notes from Catholic Mutual deposited into the Catholic Mutual Escrow Account (Catholic Mutual Account). Interest on the notes was payable at the LIBOR rate plus 0.30% to the Catholic Mutual Account. The Doe Account was under the supervision of the Boone Circuit Court, and the Catholic Mutual Account was under the supervision of the U.S. District Court for the Eastern District of Kentucky.

> The purpose of the Catholic Mutual Account was to pay all claims or portions of claims that were covered by Catholic Mutual Insurance up to the amount of

Catholic Mutual's contribution to the settlement plus interest. . . . Claims not covered by Catholic Mutual Insurance were paid by the Doe Account.

A settlement matrix sets forth four Categories of awards and ranges within each Category.[1] Category Awards were made by two Special Masters appointed by the Court beginning in September 2006, and the first installment payments were made beginning in October 2006. An appeal process was established for claimants who were denied awards or were not satisfied with the amount of their awards. As of May 29, 2009, all Category Awards have been paid in full.

The settlement agreement between the parties provides for three settlement funds in addition to the Doe Settlement Fund: (1) the Extraordinary Injury Fund (EIF), consisting of 18% of the total settlement (2) the Counseling Fund, consisting of 5% of the total settlement and (3) the Minors Fund, consisting of 5% of the total settlement. Escrow Accounts were established to segregate contributions to the Counseling Fund and the Minors Fund. Each Draw Notice executed upon the Catholic Mutual Account for an award payment included an additional 5% payment respectively to the Counseling Fund Account and to the Minor Fund Account. . . .

The EIF is applicable to all Class Members who received Category 3 or 4 awards. Those whose injuries are determined to be extraordinary as compared to other Category 3 or 4 claims may receive awards supplemental compensation from the EIF. The Special Masters examined all such cases and determined awards to those Class Members who have extraordinary injuries. An EIF award to an individual Class Member may not exceed $550,000. As of May 26, 2009, total EIF awards exceeded 18% of the total settlement by $110,574. The Court authorized the excess amount to be paid, and 100% of all EIF awards were paid. The Court also authorized the transfer of $1,429,409 from the Minors' Fund Escrow Account to the DOE Class Escrow Account to pay 100% of all EIF awards.

The Counseling Fund Account is reserved to pay for mental health treatment and related medications for any person who was sexually abused by a priest, religious, seminarian, lay teacher, or other person employed by or under the supervision of the Diocese or any Diocesan parish or institution at the time of the abuse. Eligible individuals include persons who are not eligible to participate in the class settlement and persons who did not submit a claim for monetary compensation. Counseling invoices from professionals are processed and paid by the Diocese,

---

[1]     The parties have not provided the Court with specific information regarding how various claimants were placed into the categories of the settlement matrix.

which submits an affidavit and request to the Special Masters periodically for reimbursement from the Counseling Fund Account. Whenever a counseling payment is made to the Diocese, a corresponding 22% attorney's fee is paid to Class Counsel, pursuant to the Court's Order. . . .

The Minors Fund Account is reserved to pay monetary claims made by Class Members who were born after October 21, 1980. The settlement requires the Minors Fund to terminate on November 10, 2015. No claims have been made against the Minors Fund as of May 26, 2009. . . .

[*Anderson* Record No. 50; Exhibit 4]

As outlined above, the settlement procedure provided for varying settlement payments, depending on the nature of the specific claim. The procedure specifically provided that award determinations were made by special masters approved by the court. Additionally, an appellate procedure was established for claimants who were not satisfied with their awards.[2]

---

[2]    In their motions to dismiss, the defendants explain the settlement and review procedures followed in the *Catholic Diocese* litigation. As outlined at page 5 of their motions,

> [t]hese procedures included a system of checks and balances, which provided a unique level of due process to the settlement procedure. Two (2) highly qualified Special Masters were appointed to oversee and administer the claims procedures: former chief U.S. District Judge Thomas Lambros, and William Burleigh, who was a Kentucky resident and Chairman of the Executive Committee of E.W. Scripps Co., a national news media organization. Any class member who was dissatisfied with the award made by the Special Masters was entitled to file an appeal to the Appeals Special Master, former U.S. District Court Judge Robert Duncan. Judge Duncan was formerly counsel for Ohio State University while in private practice. Any class member who sought additional review of the denial of an award could then appeal to the Boone Circuit Court, Hon. Robert W. McGinnis, the Special Judge who presided over the case.

> This multi-layered procedure provided several stages for detailed review and analysis of any claim. In addition, the entire procedure was overseen by (a) a Settlement Master (Judge Thomas Lambros), who filed status reports with the Boone Circuit Court approximately every 45 days. All of these reports were available to the class members, and included detailed statements regarding the awards made, the status of available funds, and the actual distributions made. The Settlement Master and the Independent Auditor also filed detailed final reports with the Boone Circuit Court.

[*See Anderson* Record No. 50, pp. 5-6; *Wenger* Record No. 47, pp. 5-6] The defendants have not indicated that time limits were applicable to appeals filed with the Appeals Special Master after claimants were notified

**B.      Christine Anderson (Civil Action No. 2: 10-116-DCR)**

Anderson claims to have been abused by a Catholic priest in the northern Kentucky area during the late 1960's when she was approximately seventeen years old.  According to the claim form submitted in the *Catholic Diocese* litigation, Anderson initially sought to recover a total of $1,000,000.00 for the alleged abuse.  This sum was composed of a claim for $450,000.00 from Category 4 and $550,000.00 from the Extraordinary Injury Fund. [Anderson Record No. 50; Exhibit 3] Anderson's claim was submitted by the defendants to the Special Masters on or about June 8, 2006. [*Id.*]

Although Anderson originally sought a one million dollar recovery, and asserts that her attorney Robert Steinberg promised that he would recover this sum for her, her total recovery from two of the funds was $400,000.00. [Anderson Record No. 50; Exhibit 5]  On October 9, 2006, Anderson signed a General Release as a member of the plaintiff class in the *Catholic Diocese* litigation.   [Anderson Record No. 50; Exhibit 1]   This document identified the settlement amounts contributed into the settlement fund by the Diocese of Covington as well as two insurance carriers.  Through this notarized document, Anderson also acknowledged receipt of a 25% interim distribution from one fund (Category Claim Award).  Further, upon payment of the entire amount of the distribution, Anderson agreed to a global release of claims against a number of parties.

The General Release [Anderson Record No. 50, Exhibit 1; Wenger Record No. 47, Exhibit 1] was drafted for execution by all settling claimants at the time a particular claimant

of the amounts they would receive.

received a settlement payment. It identified the specific consideration paid by each of the settling parties in exchange for a broad release of claims. Further, the specific parties being released were identified in the document. And in exchange for the receipt of settlement payments, each claimant made a number of specific representations. Due to the nature of the claims asserted in this action by Anderson and Wenger, the Court finds it necessary to quote at length from this General Release.

> . . . I, on behalf of myself and my respective attorneys, agents, heirs, administrators, executors, successors, trustees, and assigns, and any person claiming (now or in the future) by, through, or on behalf of me, shall be deemed to have fully, finally, and forever completely and unconditionally released, waived, discharged, and relinquished all claims, rights, actions and causes of action of any kind whatsoever, whether based on common law or on any federal or state statute, rule, regulation, all debts, accounts, promises, warranties, liens, damages (including but not limited to compensatory and punitive damages), agreements, costs, expenses, claims, or demands whatsoever, in law or equity, or other law or right of action, foreseen or unforeseen, matured or unmatured, asserted or unasserted, known or unknown, accrued or not accrued, suspected or unsuspected, fixed or contingent, and whether or not concealed or hidden, that I have, had, or may have individually, representatively, or derivatively or in any other capacity that relate directly or indirectly to, or that in any way are based upon or arise from, or that are in any way connected with any fact, circumstance, statement, omission, event, or other matter of any kind whatsoever that was raised or referred to, or that could have been raised or referred to, in any pleading, Claim Form, or appeal in this case against any of the following (together referred to as the "Released Parties") and shall be deemed to have covenanted not to sue any such Released Party with respect to any such claims, and shall be permanently barred and enjoined from instituting, commencing, or prosecuting any such claims against any Released Party:

> > (a)     The Roman Catholic Diocese of Covington . . . and (i) any present or former bishops, administrators, officials, priests, employees, agents, representatives, or affiliates of the Diocese; (ii) any institution, parish, or ministry which is or was owned, sponsored, or staffed by the Diocese; and (iii) the Diocese's insurers, successors, or assigns;

(b)     The Roman Catholic Diocese of Lexington and (i) any present or former bishops, administrators, officials, priests, employees, agents, representatives, or affiliates of the Roman Catholic Diocese of Lexington; (ii) any institution, parish, or ministry which is or was owned, sponsored, or staffed by the Roman Catholic Diocese of Lexington; and (iii) the Roman Catholic Diocese of Lexington's insurers, successors, or assigns with respect to such claims for events occurring up to and through the year 1988;

(c)     The Settlement Master, Judge Thomas Lambros, or his duly-appointed successor in office;

(d)     The Special Masters, Judge Thomas Lambros and Mr. William Burleigh, and the Appeal Special Master, Judge Robert Duncan, or their duly appointed successors in office;

(e)     U.S. Bank, N.A., in its capacity as Escrow Agent; and (i) any present or former officer, employee, or agent of US Bank, N.A.; (ii) and duly appointed successor escrow agent; and (iii) any present or former officer, employee, or agent of that successor escrow agent.

[*Id.*]

The only discernable difference in the release signed by Wenger on behalf of her father's estate related to the percentage payment she received upon executing the document. While Anderson received 25% of the interim distribution of the amount of her Category Claim Award ($350,000.00 X 25% = $87,500.00, less 22% attorney fee of $19,250.00, for a net payment of $68,250.00), Wenger received 100% of the interim distribution ($200,000.00 , less 22% attorney fee of $44,000.00, for a net payment of $156,000.00). The documents accompanying both releases signed by the plaintiffs clearly explain the manner in which each payment was calculated. Further, the documents identify payments made to class counsel.

Anderson claims that she did not read the release and expected to get an additional 550,000.00 as part of the settlement. As a result, she filed an appeal with the special master in accordance with the procedure set out above. As noted by the defendants, Anderson did not seek to appeal the award of $350,000.00 under Category 4 of the Matrix. Instead, her appeal was limited to the $50,000 award from the Extraordinary Injury Fund.

By letter dated November 10, 2007, Anderson submitted the following two-page appeal:

Appeals Special Master –

I am appealing the Extraordinary Fund Decision. While sitting in the conference room with Robert Steinberg at Chesley's office @ 1513 Fourth St - Cinn. Ohio, I asked Steinberg this question;

"How much will I get?"

He got up from where he was seated, walked over close to me, and stated, "I will get you 1 million."

Therefore, I want $550,000 as is stated on my claim form. I will not tolerate being promised this money, then lied to! I am in the process of turning over this fraud to the authorities as are many other class members.

One would think, after defrauding innocent victims in fen phen of millions, that defrauding us would be too risky. Obviously, that's not the case.

Christine Anderson
(address listed in original)

[Record No. 50; Exhibit 8] Thus, Anderson's claim is simple: she asked Defendant Steinberg how much she would get in settlement of her claims and he represented that he would get her $1,000,000.00. Although Steinberg presented a claim for this amount to the special master, Anderson was not awarded the amount she was told she would get. Therefore, she wants the balance to be paid by the attorneys. While prevailing on such a claim is doubtful as a matter of

law, the merits of the plaintiffs' assertions are not before the Court for resolution at this time. And while Anderson did not receive additional funds from the class settlement, her letter appeal to the Special Master dated November 10, 2007, demonstrates that, by that date, she believed that one of her attorneys had committed fraud by promising to recover $1,000,000.00 on her behalf.

The record does not fully document Anderson's efforts to appeal the payments she received in settlement. However, in the defendants' motions to dismiss, they assert that, after Anderson signed the above-referenced General Releases in December 2006, both she and Wenger filed motions with the Boone Circuit Court seeking a detained accounting of all funds received in the case and all disbursements made from any funds. However, the defendants further indicate in their motion that these requests were denied by Special Judge Robert W. McGinnis on June 3, 2009, after determining that Special Master Lambros was distributing the auditor's detailed Final Audit Report to all class members. Thereafter, the plaintiffs appealed that order to the Kentucky Court of Appeals (No. 2009-CA-001215-MR). That appeal was dismissed on December 21, 2009, and no motion for discretionary review was filed. [Anderson Record No. 50, pp. 1-2; Wenger Record No. 47, pp. 1-2] Thus, the *Catholic Diocese* litigation became final when the time to petition the Kentucky Supreme Court to review the court of appeals' decision expired.

    **C.**     **Candace Wenger (Civil Action No. 2: 10-117-DCR)**

As previously noted, Wenger's claim was submitted as an administrator on behalf of her father's estate (the Estate of Stanley Wenger). Notwithstanding that fact, she has filed the current action in her own name.

Originally, the claim filed on behalf of the Stanley Wenger estate was denied. However, the Appeal Special Master subsequently awarded the estate $200,000.00. And like Anderson, Wenger signed a general release on behalf of her father's estate. Wenger's release is dated December 18, 2007. Likewise, it appears that she received a full distribution of the settlement amount – less attorney's fees – on that date.

In support of their motion, the defendants have submitted as Exhibit 1 the General Release signed by Plaintiff Wenger on December 18, 2007. This exhibit also includes a February 15, 2006, Order of the Kenton District Court appointing Wenger as the administrator of her father's estate; the Receipt signed by Wenger and filed in the Boone Circuit Court, acknowledging receipt of $156,000.00 as the total distribution from the Doe Class Settlement Fund; a copy of a check payable to the Estate of Stanley Wenger, dated December 7, 2007; a Notice of Category Award dated December 3, 2007, from Judge Thomas D. Lambros, Special Master, notifying Wenger (i) that she would receive a full disbursement (100%) of her category award upon execution of a release and (ii) of her right to appeal the decision to the Appeal Special Master; and a document captioned "Doe Class Claims Escrow Fund Total Disbursement of Category Award Authorization" listing the Estate of Stanley Wenger as the recipient of a claim of $200,000.00.

In addition, the defendants have submitted as exhibits: the original claim packet of the Wenger Estate sent to the special masters (Exhibit 2); appeal materials submitted by the estate (Exhibit 3); financial statements submitted by Clark Schaeffer Hackett dated May 26, 2009, identical to the statements submitted in regard to the motion filed in the Anderson case (Exhibit 4); relevant portions of Wenger's deposition taken in this action (Exhibits 5, 6 and 7); a letter dated October 16, 2008, from Defendant Chesley to class members in the *Catholic Diocese* litigation advising them that, with the exception of a limited number of matters, all claims had been paid in full as of that date and that the auditor had completed it review and determined that all funds had been "properly accounted for" (Exhibit 8). The defendants have also submitted for the Court's consideration: (i) a pleading captioned "Motion for Accounting" filed in the *Catholic Diocese* litigation on or about May 26, 2009, by attorney Thomas E. Clay on behalf of Candace Wenger and three other class members (Exhibit 9); and (ii) an Order from the Boone Circuit Court filed in the *Catholic Diocese* litigation on June 3, 2009, denying the requested relief.

During her deposition, Wenger acknowledged that her father's estate received $156,000.00 in settlement in the *Catholic Diocese* litigation. [Wenger Record No. 47; Exhibit 5, pp. 120-21] However, she asserts the amount received was less than what had been represented that the estate would receive. Notwithstanding this general claim, Wenger was unable to explain the basis for her assertion. For example, while reviewing the claims utilized in the *Catholic Diocese* litigation, Wenger gave the following testimony:

Q.     But in any event, so an appeal was done?

A.     Yes, sir.

Q.     And so that's not something that they didn't do for your father's estate. They did the appeal. They filed the original claim. That came back zero. And then they took the appeal. And that turned zero into $200,000?

A.     Yes.

Q.     So they did those things for your father's estate?

A.     Yeah.

Q.     And then there was a second appeal to try to even get more money through extraordinary funds?

A.     Yes.

Q.     And would agree with that, would you not?

A.     Yes, sir.

Q.     Okay. So I'm – I'm – Miss Wenger, I'm respectfully, I'm at a loss as to what Mr. Steinberg did not do. He did the things that you wanted him to do. The claim was filed. The appeal of the denial was filed. And then yet a second appeal was file – was filed seeking even more monies. All those things were done for your father's estate.

A.     Uh-huh.

Q.     Okay. And so this isn't about money from the standpoint of what was owed your father's estate. Mr. Steinberg is not the final person who makes the decision about what will be paid for your father's estate in this class action, was he?

A.     No, he said that he had nothing to do with the money.

Q.     Well, there – there are special masters.

A.     Exactly.

Q.     And they were tasked with looking at these claims, case by case basis, weren't they?

A.     Yes, sir.

Q.      And you understood that, didn't you?

A.      Yes, sir.

Q.      It's just like going to a judge and asking the judge to make a decision on a case that we might have filed. These special masters were – that was their job, to look at each case and see what would be awarded?

A.      Yes, sir.

Q.      Then there were appeals masters, I believe you indicated?

A.      Yes, sir.

Q.      I just want your understanding.

A.      Yes.

Q.      And their job was to look at the appeal of any denial or any award that needed to be reviewed again. And so it's not something Mr. Steinberg has the ultimate authority to do as counsel for the class and as counsel for your father's estate. He's there to file, to argue for, to seek the monies. And he did do those things. And it's not – he was not the one who made the decision that it'll only be $200,000?

A.      May I speak now?

Q.      Yes, you may.

A.      Okay. Yes, I totally – I know that Mr. – yeah, I know that he is not the one that says – he told me – he goes, I'm not – he goes, I'm not the one who made that decision.

        And he said, you know, that that was their decision. He – he told me that. But in papers there was – he – it stated in papers that they are to recommend an amount on behalf of the thing. Now, that is exactly what is here in the class counsel's appeals statement – appeals statement, correct, meaning appeal?

[Wenger Record No. 47; Exhibit 6, pp. 196-98]

Later in her deposition, Wenger was shown a copy of the claim form sent on behalf of her father's estate to the special master in the *Catholic Diocese* litigation. However, Wenger denied that she had previously seen the relevant part of the form in which her attorneys proposed an award of $450,000 for her father's estate. According to Wenger, she had never before seen this portion of the form. [Wenger Record No. 47; Exhibit 7, pp. 201-03] Instead, Wenger asserted that she was unaware of any specific monetary claim being submitted by the attorneys representing her father's estate. [*Id.*] This assertion is contrary to the attestation page signed by Candace Wenger on September 25, 2006, which provides as follows:

> I hereby certify, under penalties of perjury, that the information I have provided in this Claim Form about my claim is true and accurate.
>
> I further certify, under penalties of perjury, that all other information I have provided in this Claim Form is as accurate as I am capable of providing and that I believe it to be true and accurate.

[Wenger Record No. 47; Exhibit 2]

Finally, Wenger testified that Defendant Steinberg told her that her father would likely fall within Category 4 and would be eligible for payment from the extraordinary fund.

> Q.    Okay. And now you realize that if a claim was filed, the claim had to seek something. I mean, did you ever have a discussion or write another little letter, you know, to Mr. Steinberg saying, how come a claim's being filed on behalf of my father's estate and you're not seeking any money at all? Did you ever –
>
> A.    Ask him that?
>
> Q.    – do that? Ask him that, uh-huh.
>
> A.    No. He told me he was seeking – I mean, he just promised – he said – when he read this and he interviewed and spoke to the witness, which was my father's sister, he was – he was like, this – don't. He goes, this is definitely – your father

-15-

is definitely class Category 4, and he is definitely eligible for the extraordinary fund.

And then he looked at me in a boardroom and said – and he goes, I cannot promise you this, he goes, but there should be something set up for the children of a victim like this.

[Wenger Record No. 47; Exhibit 7, p. 206]

Wenger's deposition testimony contradicts several assertions made in her Complaint. Further, she did not file an appeal following the $200,000.00 award and execution of the General Release on December 18, 2007. However, like Anderson, she did file a motion with the Boone Circuit Court seeking an accounting of all funds received and distributed in the *Catholic Diocese* litigation. Additionally, she unsuccessfully appealed the decision of the Boone Circuit Court denying her request for an accounting.

**D.      The Plaintiffs' Claims**

The *pro se* Complaints filed by Anderson and Wenger on May 27, 2010, are nearly identical. [Anderson Record No. 2; Wenger Record No. 2] Both name as defendants: Stanley Chesley, Robert Steinberg and their law firm, Waite, Schneider, Bayless, and Chesley, LPA. Each essentially asserts two counts of legal malpractice (Counts I and II) and one count based on allegations of fraud (Count III). Although enumerated as separate counts, the balance of their Complaints seek specific relief as a result of the actions alleged in Counts I through III.[3] In each pleading, the plaintiff begins by alleging facts relating to the establishment of the *Catholic Diocese* litigation. They contend that a final settlement was reached and approved by the court

---

[3]      Count IV seeks an accounting of all funds. Count V seeks disgorgement of attorney fees based on the alleged malpractice and fraud. In Count VI, the plaintiffs seek imposition of a constructive trust based on the allegations of fraud and breach of fiduciary duties.

on January 31, 2006.  However, they assert that, as claimants, they did not receive a copy of the settlement agreement but relied upon the defendants' representations regarding the details.

The plaintiffs assert that, under the settlement approved by the court, a four-tier system was created for payment of claims.  However, they contend that they were not given a copy of the matrix used for settlements.  Instead, they assert that Defendant Chesley stated, "They'll (clients) take what ever I give them!" [*Id.*]  Anderson further asserts that, "Defendant Steinberg told [her] that the abuse she suffered constituted a Category 4 level of abuse, stated to her she'd receive 'a million dollars', AND wrote such on the bottom of her claim form."  Additionally, according to Anderson, "Defendant Steinberg told [her] that the abuse she suffered qualified her to receive the maximum distribution from the EIF." [Anderson Record No. 2, p.2] Plaintiff Wenger makes identical allegations concerning the alleged statements and representations of Defendants Chesley and Steinberg in her complaint. [Wenger Record No. 2, p. 2]

The plaintiffs further assert that:

• Defendants placed claimants into one of four categories of claimants and assigned them amount of money.

• Plaintiffs were never informed as to the criteria Defendants used to assign a dollar value to individuals in the same category.

• Claimants who were dissatisfied with their awards were permitted to appeal the determination to a Special Master, but this Plaintiff received no defense/appeal assistance from Chesley/Steinberg during the appeal.

• Plaintiffs received no assistance from Defendants in appealing their cases or gathering evidence to support their claims of abuse.

• Plaintiffs have requested from Defendants a detailed accounting of the number of claimants in each category and the amounts awarded.

- Although a general statement of "accounting of settlement funds" was filed in court on or about May 28, 2009, no detailed accounting of persons paid, amounts of claims paid, nor details of how the claims were assessed was ever filed or disclosed to the claimants.

- Upon information and belief, Defendants awarded claimants who were similarly situated to Plaintiffs greater sums of money based on these claimants' cooperation in procuring Defendants' attorney fees.

- Defendants told Plaintiffs that they would receive their award sooner if they stopped "asking questions."

- Defendants told Plaintiffs that their settlement amounts would be decreased, stalled, or even denied if they did not support the attorneys' fee request made by the Defendants.

- Defendants represented to Plaintiffs that persons similarly situated to them in the class action would receive the same amount of settlement under an objective formula or scale referred to as the "Matrix."

[Anderson Record No. 2, p. 3; Wenger Record No. 2, p. 3]

Based on these specific factual allegations, the plaintiffs allege in Count I that the defendants breached certain fiduciary duties they owed as attorneys by either misrepresenting or failing to disclose material information regarding settlement funds and by their administration of the settlement fund. This includes allegations that the defendants failed and refused to answer questions regarding the manner in which individual settlement amounts were decided. Arguably, here and in other places in their Complaints, the plaintiffs either confuse, misconstrue, or ignore the role of the special masters in determining specific awards to members of the class. However, the record of this proceeding is not sufficiently developed to ascertain the specific information provided to class members about the settlement process or the role of the attorneys in that process.

Notwithstanding these allegations, the plaintiffs also allege in Count I that they were treated differently from other members of the class. More specifically, they contend that favorable treatment was given to claimants who supported the defendants' fee requests. Count I also includes claims that the defendants failed to provide specific information including copies of settlement agreements and information relating to fees and expenses deducted from settlement proceeds. According to the plaintiffs, a portion of attorney fees were improperly diverted to the defendants or to third parties on the defendants' behalf. Finally, in Count I, the plaintiffs seek to challenge the mechanics of the settlement process by alleging that it resulted in the defendants having "split loyalties" to the various claimants in the *Catholic Diocese* litigation.

In Count II, captioned "Professional Negligence," the plaintiffs allege that the defendants breached their duties to them by failing to keep them informed of the progress of the case, failed to assist them in gathering information to support their claims of abuse, failed to disclose the details of the class action settlement, as amended, and failed to disclose to them facts necessary for them to pursue their internal appeals with the Appeals Special Master.

Finally, in Count III, the plaintiffs seek to assert a claim of fraud by alleging that the defendants specifically represented to each of them that their claims were valued at nearly $1,000,000.00 and that they would recover that amount on their behalf. According to the plaintiffs, these representations were made to prevent them from objecting to the settlement of the *Catholic Diocese* litigation. Thus, the plaintiffs allege that the defendants made false representations with knowledge that they would be relied upon by the plaintiffs to their detriment.

The documents and other evidence produced in support of the defendants' motion demonstrates that Special Masters – as opposed to Defendants Chesley and Steinberg – reviewed the information submitted and determined in which class claimants would be placed. The evidence further demonstrates that, regardless of the truth of the allegations that the defendants acted fraudulently or with some corrupt motive, Anderson and Wenger believed that this conduct had occurred more than one year prior to the time they filed their respective civil actions.

## II.

### A.    Standard Of Review

The defendants have moved the Court to dismiss the Complaints filed in both civil actions on the same grounds. [Anderson Record No. 50; Wenger Record No. 47] On November 1, 2010, the parties were put on notice that the Court would consider the Defendants' motions to dismiss as motions for summary judgment in accordance with Rule 12(d) of the Federal Rules of Civil Procedure. The plaintiffs were also given an additional twenty days to file any further materials opposing summary judgment.[4]

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Chao v. Hall Holding Co.*, 285 F.3d 415,

---

[4]    The Court is aware that the time within which the plaintiffs were given to respond to the converted motions for summary judgment has not expired. However, because the Court has determined that summary judgment is not appropriate, further responses from the plaintiffs are not necessary at this time.

424 (6th Cir. 2002). A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party. Thus, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986); *see also Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008).

The party moving for summary judgment bears the burden of showing conclusively that no genuine issue of material fact exists. *Sigler v. Am. Honda Motor Co.*, 532 F.3d 469, 483 (6th Cir. 2008). Once this burden has been met, the party opposing summary judgment must "'do more than simply show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmoving party cannot merely rely upon assertions in its pleadings; rather, that party must come forward with probative evidence, such as sworn affidavits, to support its claims. Fed. R. Civ. P. 56(e)(2); *Celotex*, 477 U.S. at 324. Furthermore, "evidence submitted in opposition to a motion for summary judgment must be admissible." *Alpert v. United States*, 481 F.3d 404, 409 (6th Cir. 2007) (internal quotation and alteration omitted); *see* Fed. R. Civ. P. 56(e) (affidavit opposing summary judgment "must . . . set out facts that would be admissible in evidence[] and show that the affiant is competent to testify on the matters stated"). In deciding whether to grant summary judgment, the Court views all the facts and inferences drawn from the evidence in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587. To survive summary judgment, the nonmoving party must establish the existence of a genuine issue of material fact as to each essential element of its case. *See Celotex*, 477 U.S. at 322.

**B.** **The Plaintiffs' Claims Are Not Barred By Kentucky's One-Year Statute Of Limitations Applicable To Claims of Legal Malpractice.**

As outlined above, the plaintiffs have asserted two counts of alleged legal malpractice (Counts I and II) and one count of alleged fraud (Count III) by the defendants. The remaining counts are for specific relief relating to Counts I through III. Because a five year statute of limitations applies to claims of fraud, Count III will not be dismissed on this basis. *See* KRS § 413.120(12). Clearly, all of the allegedly wrongful conduct of the defendants occurred within five years of this action being filed. However, the defendants assert that the plaintiffs' claims of legal malpractice should be dismissed as being time-barred.

The defendants' statute of limitations arguments regarding allegations of legal malpractice are tied to the date each plaintiff received payments pursuant to the settlement reached in the *Catholic Diocese* litigation and signed the document captioned "General Release" (December 2006 for Anderson and December 2007 for Wenger). Thus, the defendants contend that the Complaints filed in May 2010 are barred by the applicable one-year statute of limitations. As the defendants correctly point out, the statute of limitations applicable in a federal diversity action is controlled by state law. *Northwestern National Insurance Co. v. Osborne*, 573 F. Supp. 1045, 1047 (E.D. Ky. 1983). And pursuant to KRS § 413.245, actions for professional malpractice must be filed within one year from the date of the occurrence or from the date when the cause of action was, or reasonably should have been, discovered by the party claiming to be injured. In making these arguments, the defendants incorrectly assume that the applicable statute of limitations is not affected by the actions taken by Anderson to appeal

the awards of the special master or by the plaintiffs' post-award efforts in the Boone Circuit Court (June 2009) and Kentucky Court of Appeals (December 2009).[5]

The statute of limitations governing legal malpractice actions in Kentucky has been construed as actually containing two separate limitation periods. The first period requires that actions must be filed within one year of the "occurrence" giving rise to the claim. The second period incorporates a discovery rule and provides that the action must be filed within one year "from the date when the cause of action was, or reasonably should have been, discovered by the party injured" if that date is later in time. *Doe v. Golden & Walters*, 173 S.W.3d 260, 270 (Ky. App. 2005); *Michels v. Sklavos*, 869 S.W.2d 728, 730 (Ky. 1994).

The present actions were filed on May 27, 2010. Therefore, to avoid dismissal, the plaintiffs must establish that (i) the occurrence giving rise to the claims did not occur prior to May 28, 2009, or (ii) the plaintiffs did not discover, and could not have reasonably discovered, that they had claims to assert prior to that date. Here, the discovery rule is not an issue because the plaintiffs claim that they were aware of the allegedly wrongful actions prior to May 28, 2009.[6] However, under Kentucky case law, their claims did not accrue until after the plaintiffs were unsuccessful in getting additional payments awarded by the Appeals Special Master and

---

[5]    The defendants have not filed copies of the plaintiffs' pleadings filed in these state courts. However, they assert that part of the relief sought in this proceeding – an accounting – is identical to the request filed with the Boone Circuit Court and the Kentucky Court of Appeals. It is unclear whether the state court proceedings asserted claims of fraud and/or legal malpractice. The defendants argue that the present action is an impermissible collateral attack on the decision of the Kentucky Court of Appeals. However, they do not provide sufficient document or authority to support of this assertion.

[6]    In reaching this conclusion, the Court notes that it is not addressing at this time the merit – or lack of merit – of the claims asserted by either plaintiff.

after the challenges to the rulings of the Boone Circuit Court had been fully exhausted (December 21, 2009). At that point, their present claims accrued.

The Kentucky Court of Appeals discussion in *Doe v. Golden & Walters*, 173 S.W.3d 260, 270 (Ky. App. 2005), is instructive regarding the date the plaintiffs' claims of legal malpractice accrued. As the *Doe* court explained:

> "Occurrence" has been construed as synonymous with "cause of action" in KRS 413.245 based on the statutory language. Moreover, the Kentucky Supreme Court has cited, with approval, the following statutory construction by a federal court: "The use of the word "occurrence" in KRS 413.245 indicates a legislative policy that there should be some definite, readily ascertainable event which triggers the statute." This triggering event is "the date of 'irrevocable non-speculative injury." The statute of limitations for legal malpractice does not begin to run "until the legal harm [becomes] fixed and non-speculative."
>
> The discovery provision of KRS 413.245 does not come into play if a suit for legal malpractice was filed within one year from the date of the occurrence. Logically, a party may not "discover" a cause of action that does not yet exist. Any other interpretation of KRS 413.245 would allow the statute of limitations to begin running and possibly even expire before a cause of action for legal malpractice has accrued, which is the function of a statute of repose not a statute of limitations.
>
> This raises the question of when the damages for legal malpractice become fixed and non-speculative. One type of negligent conduct on which a legal malpractice claim might be based is litigation negligence, which has been described as "the attorney's negligence in the preparation and presentation of a litigated claim resulting in the failure of an otherwise valid claim[.]" When a claim for legal malpractice is based on litigation negligence, whether the attorney's negligence has caused any injury or damages necessarily is contingent on the final outcome of the underlying case. Any alleged injury is merely speculative until the result of the appeal or the underlying litigation becomes final and the trial court's judgment becomes "the unalterable law of the case."

(Citations omitted.) *Id.* at 271.

Under this rationale, the injuries alleged by the plaintiffs did not become "fixed and non-speculative" until their appeal of the decision of the Boone Circuit Court was denied on December 21, 2009. Their Complaints were filed within one year of this date. Thus, the defendants argument that the case should be dismissed by virtue of the one-year statute of limitations contained in KRS § 413.245 fails.

C.    **The General Releases Signed By The Plaintiffs Do Not Preclude Claims For Legal Malpractice Allegedly Committed By Their Attorneys.**

Based on the broadly-worded General Release executed by each Plaintiff, the Defendants also assert that the claims they seek to assert are barred as a matter of law. They argue that the language of the releases specifically establishes that Anderson and Wenger have been fully satisfied for any claim relating to alleged abuse by the defendants in the *Catholic Diocese* litigation. Citing *Mattingly v. Hodge,* 2007 U.S. Dist. LEXIS 5221 (W.D. Ky. 2007) (holding that a "plaintiff cannot claim as damages in a legal malpractice case those amounts that she voluntarily surrendered in settlement"), and *Mitchell v. Transamerica Insurance Co.*, 551 S.W.2d 586 (Ky.App. 1977), the defendants assert that each plaintiff "has released and forever waived her right to seek further damages against the Diocese and the Special Masters (who made the award, and denied her appeal). Consequently, she cannot possibly seek such damages from the Defendants." [Anderson Record No. 50, p. 9; Wenger Record No. 47, p. 9]

This argument may be correct as far as the releases go. It is true that the defendants named in the *Catholic Diocese* litigation are entitled to the benefits of the releases signed by the plaintiffs. Likewise, the special masters are subject to the protections contained in the releases. However, the defendants were not included as parties subject to the terms of the releases.

Further, they may not rely upon the releases executed October 9, 2006 (Anderson) and December 18, 2007 (Wenger) to avoid liability for wrongful conduct allegedly occurring after those dates.[7]

The cases cited by the defendants do not alter this result. In *Mattingly v. Hoge*, 2007 U.S. Dist. LEXIS 5221 (W.D. Ky. 2007), Patricia Mattingly sued her former attorney, William Hoge, alleging negligent representation during a divorce proceeding in the Jefferson Circuit Court. The essence of the claim was an alleged failure to insure that a minor child (Logan Mattingly) remained the primary beneficiary under a life insurance policy covering the plaintiff's ex-husband, Joseph Mattingly. The life insurance policy in issue was part of Joseph's retirement benefit plan with his employer, General Electric. Patricia Mattingly claimed that Hoge breached his professional duties by failing to obtain a Qualified Domestic Relations Order ("QDRO") pursuant to relevant provisions of ERISA, 29 U.S.C. §1056 (d) (3) (B) & (C) (2006), and by failing to notify the plan administrator of the existence of the parties' Divorce Judgment which required that Joseph designate Logan as primary beneficiary on any life insurance maintained through his employment with General Electric.

---

[7]     It should be noted that the parties have not completed discovery. However, the defendants have been given the opportunity to take a limited deposition from each plaintiff to more fully understand the nature of the claims being made. Thus, the defendants have not yet addressed issues involving their review of the relevant provision of the general releases with the plaintiffs or the plaintiffs' execution of the releases. Likewise, the Court does not address in this opinion the effect of the specific provisions of the releases, such as the paragraph which specifically states that each plaintiff,

> [w]arrant[s] that [she] has not been coerced or induced to execute this Release by any warranty, representation, promise, agreement, or threat made by or on behalf of the Released Parties or any other person or entity other than those matters specifically set forth in the settlement contained in the May 17, 2005 Memorandum of Understanding and the July 18, 2005 Supplement thereto, the Notice of Proposed Class Action Settlement, which [she] received in the case, and the Order Approving Settlement entered by the Court on January 31, 2006.

[Anderson Record No. 50, Exhibit 1; Wenger Record No. 47, Exhibit 1]

The Divorce Judgment was entered by the Jefferson Circuit Court on December 17, 1987. Eight years later, Joseph Mattingly remarried and designated his new wife, Anita, as primary beneficiary for his life insurance policy. Logan was designated as one of two contingent beneficiaries. Joseph died on November 28, 2002. Less than one week later, Patricia Mattingly filed a claim for the life insurance proceeds on behalf of Logan. Anita Mattingly filed a competing claim on December 19, 2002. Under ERISA and the terms of the General Electric retirement benefit plan, the plan administrator had the responsibility to investigate the competing claims and determine the proper beneficiary.

On March 8, 2002, Patricia Mattingly filed suit in state court in Indiana demanding full payment of the policy proceeds for her son. Three days later, the plan administrator determined that the Divorce Judgment met the requirements of a QDRO and that the claim submitted by Anita Mattingly should be denied. Anita then notified the plan administrator that she disputed this conclusion. Thereafter, an interpleader action was filed in the United States District Court for the Western District of Kentucky seeking to determine the rightful recipient of benefits under Joseph's life insurance policy.

On June 2, 2003, Patricia and Anita Mattingly settled the interpleader action by dividing the proceeds 50/50. Patricia Mattingly then sued her attorney to recover the remaining 50%, arguing that she would not have settled her claim had Hoge properly notified the plan administrator of the QDRO. The district court rejected the plaintiffs' claims for several reasons. First, the court noted that, at the time the Divorce Judgment was filed (1987) the law was unsettled regarding whether QDRO provisions concerning insurance policy beneficiaries pre-

empted ERISA. Additionally, the notice of the existence of a QDRO would not alter its status or the plaintiff's rights under it. Under federal law, "the administrator of the plan initially determines whether a court order is a QDRO." *Id.* at *12-*13 (citing 29 U.S.C. §1056(d)(3)(G)(i)(II). Therefore, "even if a duty existed to notify the plan administrator, the failure to do so did not alter [the plan administrator's] ultimate responsibility or the outcome of [the] case in any apparent manner." *Id.* at *13. And as the court pointed out, even if Hoge had provided the plan administrator with a copy of the Divorce Judgment in 1987, that would not have prevented Joseph Mattingly from listing Anita as beneficiary ten years later.

Finally, the district court addressed the point raised in the present case by the defendants: that is, whether the plaintiff's settlement precluded a claim for legal malpractice for the amount that she voluntarily surrendered in settlement. Citing *Mitchell v. Transamerica Ins. Co.*, 551 S.W.2d 586, 588 (Ky. App. 1977), the court held that because Patricia Mattingly's rights had not been compromised by Hoge's actions, she suffered no legal damages. Thus, where a plaintiff has "had the right to fully litigate all claims against the original defendants in a court of competent jurisdiction before electing instead to settle, the plaintiffs could not prove that they had suffered damages caused by their attorney." *Id.* at *16 (citing *Mitchell*, 551 S.W.2d at 588). Further, this was unlike the situation in which a plaintiff is forced to settle because of an attorney's negligence which severely limits the plaintiff's claims. *See Goff v. Justice*, 120 S.W.3d 716 (Ky. App. 2002) (settlement by plaintiffs did not preclude a finding of damages in a legal malpractice action when their prior attorney's negligence had resulted in court orders limiting the presentation of expert testimony in a medical malpractice action); *Kirk v. Watts*, 62

S.W.3d 37 (Ky. App. 2001) (settlement by the plaintiff did not preclude a finding of damages in a legal malpractice action when the prior attorney's negligence resulted in the lost opportunity for the client to maintain a case in her own name rather than by her trustee in bankruptcy).

In the present case, the plaintiffs' claims are based, in part, on the defendants' alleged failures to properly represent their interests in seeking to obtain larger awards from the special masters. Unlike the facts presented in *Mattingly*, *supra,* the plaintiffs have not had the opportunity to fully litigate these claims. Here, the plaintiffs allege that their rights were compromised by their former attorneys' actions following settlement and execution of the general releases. And while the plaintiffs' claims may be based, in part, on their misunderstanding of the duties owed to them by the defendants' in the context of a class action settlement proceeding, those issues are not presented for resolution at this time. Thus, based on the current state of the record, the Court must conclude that issues of disputed fact preclude summary judgment in the defendants' favor.

### D. The Plaintiffs' Claims Do Not Constitute An Impermissible Attack On The Judgment Of the Boone Circuit Court.

The defendants argue that, because the plaintiffs and others: (i) filed a motion in the Boone Circuit Court inquiring about their placement in the settlement matrix; (ii) previously requested copies of file materials; (iii) previously requested a detailed accounting of funds received and disbursements made in the *Catholic Diocese* litigation; and (iv) had their various requests denied by the Boone Circuit Court, those matters may not be raised in this proceeding. They contend that to allow such would be an impermissible collateral attack on the prior state court proceeding. While the defendants cite *Celestina Adame, et al., v. Law Office of Allison &*

*Huerta*, 2008 Tex.App. LEXIS 3912 (Tx., 2008), and *Pieper v. American Arbitration Association, Ins.*, 336 F.3d 458 (6th Cir. 2003) (holding that lower federal courts lack subject matter jurisdiction to engage in appellate review of state court proceedings), for this proposition, they have failed to file many of the pleadings relating to this assertion. More importantly, the defendants seem to confuse causes of action with claims for relief based on legal malpractice and fraud. Here, the plaintiffs are not attempting to litigate *claims* which were litigated previously in the Kentucky state courts. While the relief ultimately being sought may be limited or moot, the defendants are not entitled to dismissal of the plaintiffs claims at this stage of the proceedings under the *Rooker-Feldman* doctrine.

## III.

Although the defendants originally sought to dismiss the claims asserted by the plaintiffs pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, they relied upon a number of matters which were not included in the parties' pleadings. Thus, the Court converted the motions to dismiss into motions for summary judgment in accordance with Rule 12(d). However, summary judgment is not appropriate at this time for the reasons argued in the defendants' motions. First, the statute of limitations for legal malpractice does not accrue on the date each plaintiff signed a General Release. Rather, the one-year statute applicable to Counts I and II commenced when the plaintiffs' damage claims because fixed and non-speculative. Under Kentucky case law, the plaintiffs filed their Complaints within one year of that date.

Likewise, summary judgment is not appropriate at this time based on the argument that the terms of the General Releases signed by the plaintiffs extend to the defendants as their

attorneys. Further, the defendants may not obtain dismissal of the plaintiffs' *claims* because the plaintiffs sought similar *relief* in the *Catholic Diocese* litigation. While the relief may be similar to the relief sought in this action, the claims are different and not precluded by the abstention doctrine cited in the defendants' motions. In short, while summary judgment may ultimately be appropriate, the record has not been sufficiently developed to grant such relief at this time. Accordingly, it is hereby

**ORDERED** that the defendants' motions to dismiss [Wenger Record No. 47; Anderson Record No. 50] are **DENIED**.

This 16th day of November, 2010.



Signed By:
*Danny C. Reeves*
United States District Judge